## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KENNETH W. PERRY,
    *Plaintiff,*

Case No. 3:26-cv-_0859_

v.

**DBBMCKENNON (a California professional accountancy firm); MICHAEL McKENNON, CPA; and RUSSELL BOYER, CPA,**
    *Defendants.*

### JURY TRIAL DEMANDED

### COMPLAINT FOR TORTIOUS INTERFERENCE WITH CONTRACT, CIVIL CONSPIRACY, RECKLESS MISREPRESENTATION / GROSS NEGLIGENCE, NEGLIGENT MISREPRESENTATION, AND PROFESSIONAL NEGLIGENCE

Plaintiff Kenneth W. Perry, appearing *pro se* and reserving the right to amend upon engagement of counsel, brings this action against dbbmckennon and the individually named certified public accountants, and alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff Kenneth W. Perry served as the Chief Financial Officer of Regenerex Pharma, Inc. ("Regenerex"), an SEC-reporting issuer (OTC: RGPX). Defendant dbbmckennon (the "Firm") was Regenerex's independent registered public accounting firm from approximately 2022 forward, and the individual Defendants are partners and engagement personnel of the Firm.

2. For several years before Plaintiff's arrival, the Firm audited Regenerex without the reasonable care and professional skepticism its standards required, and issued or supported audited financial statements that were materially false in respects provable on the face of the documents. When Plaintiff, as the Company's new CFO and certifying officer, identified that fraud and reported it in a documented notification under Section 10A of the Securities Exchange Act, the Firm confronted a choice: act on the disclosures and correct its work — which would have required Regenerex to restate approximately two to three years of SEC filings and would have exposed the Firm's own audit failures, together with an undisclosed relationship between the Firm's founding partner and the Company's controlling person — or protect itself. The Firm chose to protect itself.

3. Rather than discharge the duties a Section 10A notification triggers, the Firm allied itself with the very management whose conduct Plaintiff had reported. It conducted the audit through the subject of the disclosures while shutting the certifying officer out of it; it conveyed Plaintiff's protected communications to persons with authority to retaliate against him; and it never made the Section 10A report, never resigned, and never filed the Form 8-K disclosure its position required. That alliance gave Regenerex both the cover and the means to suspend Plaintiff and then to terminate him.

4. This action seeks recovery for the harm the Firm's conduct foreseeably caused Plaintiff — the loss of his employment, his equity compensation, and his professional standing. The Firm's motive in aligning with Regenerex against the officer who reported the fraud is neither speculative nor incidental: acknowledging what Plaintiff reported would have forced the restatement of years of the Firm's own audited filings and exposed the Firm's independence violation, and the Firm shared with Regenerex's principals a direct, self-protective interest in seeing the messenger removed rather than the misstatements corrected.

## II. PARTIES

5. **Plaintiff Kenneth W. Perry** is a citizen of Tennessee, residing in Sumner County. He served as CFO of Regenerex from April 1, 2025, under a written Employment Agreement effective March 31, 2025, until his purported for-cause termination, effected by notice delivered May 2, 2026.

6. **Defendant dbbmckennon** is a California public accounting practice and a PCAOB-registered public accounting firm, with its principal office at 20321 SW Birch Street, Suite 200, Newport Beach, California 92660, and additional offices in California. If dbbmckennon is a professional corporation, it is a citizen of California, the State in which it is organized and maintains its principal place of business. If dbbmckennon is instead a partnership, limited liability partnership, or limited liability company, it is a citizen of each State of which any partner or member is a citizen, and, on information and belief, none of its partners or members is a citizen of Tennessee. Under either characterization, dbbmckennon is not a citizen of Tennessee, and complete diversity exists.

7. **Defendant Michael McKennon, CPA** is a citizen of California and a founding partner of the Firm.

2

8. **Defendant Russell Boyer, CPA** is a citizen of California and the partner the Firm designated as its "objectivity reviewer" following Plaintiff's March 11, 2026 disclosures.

9. **Marianne D'Elia, CPA,** a citizen of California, served as the Firm's engagement audit liaison for Regenerex and is a material witness to the conduct alleged. Her acts and communications described in this Complaint were taken within the scope of her engagement on behalf of the Firm and are attributable to the Firm; she is not named individually as a defendant.

10. **Non-party Yasmine Berg** is an individual residing in Vancouver, British Columbia, who at all material times acted as an undisclosed controlling person of Regenerex and was never disclosed in any Regenerex SEC filing as an officer, director, beneficial owner, or controlling person. Berg is not named as a defendant in this action but is described throughout because her relationship with the Firm's founding partner and her direction of Regenerex's financial reporting are central to the conduct alleged. Berg's de facto control was pervasive: Plaintiff's contemporaneous records reflect no fewer than 165 days of email, text, telephone, or in-person contact with Berg over his one-year tenure, spanning the Company's financial reporting, audit preparation, capital raises, equity transactions, and the specific obligations at issue here. Berg also functioned as an undisclosed related-party lender to Regenerex through Black Star Holdings Ltd., a Berg-affiliated entity — a relationship disclosed in no Regenerex SEC filing. That frequency and reach of contact, by a person holding no disclosed corporate role, is itself evidence of the controlling-person relationship alleged throughout this Complaint.

## III. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Tennessee; each Defendant is a citizen of California; complete diversity exists; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over each Defendant. The Firm audited an issuer whose principal place of business is in Tennessee, directed audit communications into Tennessee to Regenerex's Tennessee-based management and directors over a period of years, and engaged in the Tennessee-directed conduct described below, from which Plaintiff's claims arise. Each individual Defendant is independently subject to this Court's jurisdiction for his own Tennessee-directed conduct. Defendant Boyer directed communications into Tennessee to Plaintiff, the

Tennessee-resident certifying officer — including the March 18, 2026 telephone call described below — and directed the Firm's handling of Plaintiff's Tennessee disclosures. Defendant McKennon directed the conveyance of Plaintiff's Tennessee communications, through Yasmine Berg to Regenerex's directors, that produced the retaliatory acts Plaintiff sustained in Tennessee. Each intentionally aimed his conduct at Tennessee, knowing that the resulting harm would be felt by Plaintiff there.

13. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims — including the audit of a Tennessee issuer, Plaintiff's reliance in Tennessee, and the harm to Plaintiff in Tennessee — occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Engagement and Plaintiff's Reliance

14. The Firm served as Regenerex's independent registered public accounting firm from approximately 2022 forward and issued audit opinions on Regenerex's annual filings during that period. Those opinions, and the audited financial statements they accompanied, were filed with the SEC and were reasonably foreseeable to be relied upon by the Company's officers, lenders, counterparties, and investors.

15. Plaintiff relied on the Firm's audit opinions in deciding to accept the position of CFO of Regenerex in March 2025. Plaintiff is a senior healthcare-finance executive with thirty-nine years of experience. He understood Regenerex, on the strength of its audited financial statements, to be a stable issuer presenting limited personal risk to an incoming certifying officer. Had the matters later identified been reflected in the Firm's audit work, Plaintiff would not have accepted the position.

16. After accepting the position, Plaintiff relied on the Firm's audit work again, in a second and distinct capacity, as the officer legally required to certify Regenerex's periodic SEC filings under Sections 302 and 906 of the Sarbanes-Oxley Act. The Firm knew that the issuer's CFO was the person who would rely on its audit opinions for that certification purpose.

### B. The Defective Audits the Firm Later Had to Protect

17. The audited financial statements the Firm supported for Regenerex were materially false in multiple respects, two of which are fundamental and provable on the face of the documents. These

are the failures that, once Plaintiff reported them, the Firm had a direct institutional interest in suppressing, because acknowledging any of them would have required Regenerex to restate its SEC filings and would have exposed the Firm's own departures from professional standards. Each of the two central failures concerns a material item that the Firm's audit either recorded on, or kept off of, Regenerex's financial statements without the evidence any competent auditor was required to obtain.

**18. The $2,400,000 Greenwich Resources note — recorded with no verification of anything.** Regenerex's books reflected a $2,400,000 note payable to a counterparty identified as "Greenwich Resources," carried and re-confirmed across successive reporting periods. The Firm allowed that obligation, and its successive renewals, to be recorded and reported in audited financial statements without performing the verification PCAOB standards require for a material related-party balance. It did not verify the parties to the agreement: it obtained no independent confirmation that the counterparty existed — a search of the United Kingdom Companies House register returned no entity named Greenwich Resources Inc., and a search of the British Columbia corporate registry returned only a long-dormant entity formerly named Saudi Petroleum Corp., registered in 1979 and renamed in 1980, which could not be the counterparty to a 2023 intellectual-property purchase — and the sole signatory, "Alexi Sayed," had no verifiable existence and was never produced. It obtained no independent valuation of the intellectual property purportedly acquired in exchange — which had no demonstrated proprietary value and consisted of general information freely available on the internet rather than any proprietary asset. And it never independently confirmed the obligation or its successive renewals through a direct confirmation request to the purported counterparty — the basic audit procedure that, had it been performed, would have revealed that no such counterparty existed and that no genuine, arm's-length obligation had ever been incurred. The Firm instead recorded and re-confirmed a $2,400,000 liability on the strength of management's say-so and the instruments management supplied, which bore an identical reproduced signature across multiple documents rather than independent original signatures. PCAOB AS 1105 (Audit Evidence), AS 2310 (The Confirmation Process), AS 2401 (Consideration of Fraud), AS 2410 (Related Parties), and AS 2502 (Auditing Fair Value Measurements) were each violated.

5

19. **The $10,000,000 related-party obligation kept off the balance sheet as "contingent consideration."** A November 15, 2021 Asset Purchase Agreement — a signed, formal instrument — created a $10,000,000 obligation running to Regenerex's CEO, Gregory Pilant, in connection with the Company's acquisition of certain intellectual property. In its periodic SEC filings, Regenerex reported that obligation as contingent consideration payable at fifteen percent (15%) of gross revenues and investment proceeds over a sixty-month period, disclosed under commitments and contingencies rather than carried as a fixed liability — a treatment that kept a $10,000,000 related-party obligation off the Company's balance sheet. That treatment was established before Plaintiff became CFO; and when Plaintiff inquired, the Firm, through its engagement liaison D'Elia, confirmed in writing that the obligation had not been recorded as a note. The Firm accepted that off-balance-sheet treatment on the strength of management's representation and an email conveyed through Berg or a Company officer, without ever obtaining or examining a signed amendment to the Asset Purchase Agreement, and without inquiring whether the signed instrument that created the obligation had ever been validly amended to support treating a fixed $10,000,000 obligation as a mere contingency. An auditor does not accept a $10,000,000 departure from the express terms of a signed instrument on the strength of an email or a management representation. AS 1105 required the Firm to obtain sufficient appropriate audit evidence — at a minimum, a valid written amendment, a supporting and valid Board action, and a legal opinion as to the modification's validity — before accepting that treatment, and the Firm obtained none of it.

20. The contingent-consideration treatment also lacked the related-party scrutiny the item demanded: the obligation ran to the Company's controlling officer, yet the Firm obtained no related-party disclosure adequate to the character and magnitude of the item and no Board process commensurate with a $10,000,000 obligation to an insider. Worse, the same controlling parties simultaneously treated and collected on the obligation as a fixed personal note. By a written consent dated January 29, 2025, the Board purported to increase the payment rate from the fifteen percent (15%) contractual rate set by the Asset Purchase Agreement to twenty-five percent (25%) of any money raised or revenue, and Pilant in fact caused the Company to pay him at the enlarged rate. That modification was a related-party transaction benefiting the controlling officer, and it was invalid on the face of the governing documents: the January 29, 2025 written consent did not satisfy the Asset Purchase Agreement's own amendment requirement (Section 11.02), because it lacked the signature of a co-Seller and co-counterparty to the obligation (Deborah Pilant) whose

signature that provision required, and the sole beneficiary of the increase, Pilant, voted to approve it without recusal. The invalidity was apparent from the face of the documents themselves and required no specialized analysis to detect. A competent auditor confronted with a related-party rate increase of that character would have required independent legal review of the modification's validity — and would have noted the absence of any such review — before accepting any accounting effect from it. The Firm did neither. An auditor exercising the required professional skepticism would have identified the obligation as a material related-party item demanding confirmation, related-party disclosure, and evaluation of the rate increase. PCAOB AS 1105 and AS 2410 were each implicated.

21. That the obligation was, in substance, a fixed note owed to the CEO — not the contingent arrangement reflected in the Company's public filings — is confirmed by the CEO's own conduct. In the period preceding Plaintiff's termination, Pilant circulated a Consolidated Purchase and Assignment Agreement that, by its terms, described the obligation as a non-interest-bearing $10,000,000 note, fixed the payment rate at twenty-five percent (25%), and extended the maturity to November 15, 2029. That instrument was never approved by the Board and remains unexecuted, but it exists and demonstrates that the controlling parties treated the obligation as a fixed, enlarged personal note when collecting from the Company, while the Company's public filings carried it off the balance sheet as contingent consideration. The Firm's acceptance of that dual characterization, without the related-party scrutiny the item required, allowed a materially incomplete presentation of a $10,000,000 related-party obligation to stand.

22. **Additional audit failures — unqualified spousal CFO.** Before Plaintiff's tenure, Deborah Pilant — the spouse of Regenerex's CEO, with no accounting credentials and performing no substantive CFO work — served as Regenerex's CFO and signed SEC certifications. The Company's EDGAR filings, including the Forms 10-Q for the periods ended December 31, 2022 (filed January 24, 2023) and December 31, 2023 (filed February 5, 2024), reflect a mismatch in which the certification text names "Irene Getty, Chief Financial Officer" while the signature line reads "/s/ Deborah Pilant, Chief Financial Officer." PCAOB AS 2410 required identification of the CEO's spouse as a related party; PCAOB AS 2201 required identification of an unqualified CFO as a material weakness in internal control. The Firm issued unqualified opinions during this period and did not surface the certification-signature mismatch.

23. **The Memphis Woundcare Labs lease.** Regenerex paid a related-party entity (Woundcare Labs, LLC, managed by the CEO's brother) a lease rate that reached approximately 2.5 times the fair-market rate for comparable Memphis space — an increased rent of approximately $18,000 per month against a market rate of approximately $7,292 per month — justified by a representation that the Memphis facility held FDA certification. On January 18, 2026, the facility's chemist, Andrew Boyd, confirmed in writing that the facility never held an FDA license under Regenerex, was closed from approximately May 15 through the end of July 2025, and never produced a full production run. The Firm did not independently verify the FDA representation or the lease valuation. PCAOB AS 2410 and AS 2502 were implicated.

24. **Undisclosed insider stock sales.** The CEO sold personal Regenerex shares to no fewer than four identified purchasers over a three-year period — Dr. Mark Jackson (approximately $1,820,000 across ten transactions); Damon Faulkner and Brad Cleaver, who together purchased approximately $60,000 of shares through Medformance LLC; and the CEO's personal pastor (approximately $150,000) — together with additional purchasers the CEO acknowledged in a recorded conversation. The quantified sales to these purchasers total approximately $2,030,000. No Forms 4 were filed for any of these transactions, and the Company filed no Form D during the same period, when it was contemporaneously raising capital from outside investors at $1.00 per share — roughly six times the approximately $0.167 average per-share price at which the CEO sold his personal shares. PCAOB AS 2401 required a fraud-risk assessment addressing such insider transactions; the Firm performed no escalated procedures. The Firm never directed any inquiry to Plaintiff, the certifying officer, concerning insider or related-party sales of Company stock — a basic inquiry the circumstances required. On February 11, 2026, after learning of the private stock sales, Plaintiff participated in a telephone call with director Ori and Berg in which they discussed Pilant's stock sales and a plan to cover up those sales by having Pilant issue promissory notes to each purchaser, recharacterizing the sales as loans.

25. **Unregistered Malaysia capital raise.** Before Plaintiff's arrival, the Company raised approximately $2,500,000 from Malaysia-based investors. That offering was not registered, and the Company filed no Form D or other filing perfecting an exemption from registration; the Firm's own management representation letter confirms that the Company had "not sold securities under a registration statement", yet the raise was reflected only in the footnotes to the Company's filings

and was never tested or disclosed as an unregistered securities offering carrying potential rescission and contingent-liability exposure. Notwithstanding that representation, the Firm obtained no evidence that the offering had been registered or that any exemption from registration had been validly perfected, performed no procedures to confirm the offering's compliance with the Securities Act registration framework, and evaluated none of the rescission and contingent-liability exposure that an unregistered offering of that magnitude creates. From the proceeds of that raise, CEO Pilant caused approximately $625,000 to be paid to himself at the twenty-five percent (25%) rate and used those funds to acquire a personal interest in Holista Biotech Sdn Bhd — a related-party diversion of investor proceeds the Firm neither scrutinized nor evaluated for its effect on the Company's reporting. PCAOB AS 1105, AS 2401, and AS 2410 were each implicated.

26. **CEO self-dealing.** Documented overpayments to the CEO — approximately $105,000 in unauthorized self-payments; approximately $625,000 paid to the CEO from a single February 2025 capital raise at a twenty-five percent (25%) rate, of which approximately $300,000 was in excess of the fifteen percent (15%) contractual rate set by the Asset Purchase Agreement; an undisclosed housing subsidy; and personal-errand utilization of a Company-paid employee — directly affected current-year expenses. PCAOB AS 2810 (Evaluating Audit Results) was implicated. The Firm recorded no audit adjustment as to any of these items.

**C. Plaintiff's March 11, 2026 Section 10A Disclosure**

27. On March 11, 2026, Plaintiff transmitted to the Firm a documented evidentiary package — including his Comprehensive Memorandum, an Auditor Notification Letter, a CFO Action Report, and the Greenwich Comprehensive Analysis — constituting a notification under Section 10A of the Exchange Act. He simultaneously transmitted that package to the Regenerex Board and to the SEC under the whistleblower program, and provided his Circular Scheme Analysis to the Firm and the Board on March 17, 2026.

**D. The Firm's Alliance With Regenerex After the Disclosure**

28. On March 12, 2026, the Firm's audit liaison, D'Elia, replied in writing: "Thank you for bringing this to my attention. We have involved a third partner for objectivity. We will get back to you shortly." The Firm identified Defendant Boyer as that "third partner." Boyer had not been on the engagement before Plaintiff's disclosure and was added within twenty-four hours of it.

29. On or about March 18, 2026, Plaintiff spoke by telephone with D'Elia and Boyer for approximately ten minutes. Boyer stated, in substance, that "if Regenerex was private we would not be talking about this and most of this relates to SEC reporting and not the financial audit," and that "it happens all the time in closely held companies." Boyer asked Plaintiff why he had reported the matters — a question posed in a manner that treated Plaintiff's disclosures, rather than the underlying misconduct, as the impropriety. Boyer declined Plaintiff's request to share the audit questions the Firm was directing to management — information Plaintiff needed as the certifying officer. No substantive follow-up occurred.

30. The matters Plaintiff disclosed had direct financial-statement consequences and were squarely within the scope of the Firm's audit, not merely "SEC reporting" matters. An objectivity reviewer evaluating a Section 10A notification from the certifying officer evaluates the substance of the disclosure, shares the audit response with that officer, and does not question the officer's motive for reporting. Boyer did the opposite.

31. Between March 11 and March 31, 2026, the Firm conducted its audit communications with the CEO — the principal subject of Plaintiff's disclosures — and the compromised Board, without including Plaintiff, the certifying officer. By the Board's own admission on March 12, 2026, the CEO had received outstanding audit questions from the Firm and had not forwarded them to Plaintiff. On March 26, 2026, Plaintiff objected in writing directly to D'Elia and Boyer, invoking his Section 302 and 906 obligations and demanding real-time access to auditor correspondence. The Firm did not respond, and the pattern continued.

32. The Firm has never resigned the engagement, never filed a Form 8-K Item 4.01 or Item 4.02, and never filed a Section 10A report with the Commission. The consequences are reflected on the public EDGAR record. Regenerex filed a Form NT 10-K on March 30, 2026, invoking the fifteen-day extension under Rule 12b-25; that extension expired on April 15, 2026; and the transition-period Form 10-K for the nine-month period ended December 31, 2025 has remained unfiled. The disclosures Regenerex has made since concern only Plaintiff's suspension, his termination, and litigation the Company commenced against Plaintiff and another party. Although Regenerex has known since March 11, 2026 of Plaintiff's protected whistleblower complaint and his contemporaneous report to the Commission, it has disclosed none of that — not the whistleblower complaint, not the Section 10A notification, and not the resulting pause in the audit — publicizing

10

the adverse actions taken against the whistleblower while withholding the protected activity that prompted them. The Firm has remained Regenerex's auditor of record throughout, while the issuer's periodic reporting remained false, incomplete, and overdue, and while the issuer retaliated against Plaintiff rather than remediate.

33. Regenerex engaged Alan V. Viernes, a certified public accountant, in December 2025 to provide additional audit support at the Firm's request; because of the Company's funding constraints, Viernes did not begin substantive work until later. His role was limited to that of an intermediary reviewer: he reviewed the materials Plaintiff submitted to the Firm before the Firm conducted its own review, and at no time did he identify anything in Plaintiff's submissions that required change — confirming that Plaintiff's work product was sound. Viernes's contemporaneous text messages with Plaintiff corroborate two further matters central to this Complaint. First, after Plaintiff's March 31, 2026 suspension the audit did not progress: as of mid-April 2026 the audit testing remained incomplete and no Form 10-K draft existed, even though Plaintiff had uploaded the supporting documentation, transferred all systems and files to the Company, and been relieved of all duties — confirming that the audit stalled through the conduct of the Firm and management, not through any omission by Plaintiff. Second, CEO Pilant represented to Viernes that Plaintiff had been "re-engaged to continue work" and was "supposed to continue on" because the Company had paid him — representations that were false, because Plaintiff was at all relevant times suspended, relieved of his duties, and without system access. Neither the Firm nor Viernes verified Plaintiff's status with the certifying officer himself; the audit function instead proceeded on management's false account of it.

**E. The Independence Failure and the Conveyance**

34. At 10:27 a.m. on May 5, 2026, Plaintiff transmitted a written status inquiry concerning the audit to the Firm — to D'Elia and Boyer — and to no one at Regenerex. The Firm did not respond. At 2:46 p.m. that same day, roughly four hours later, Plaintiff received a cease-and-desist email from Regenerex director Lee Ori that expressly acknowledged Plaintiff's "direct outreach to the Company's independent auditors" and directed Plaintiff to cease all further communications "with the Company's auditors". Plaintiff had transmitted that inquiry only to the Firm; the sole parties aware of it were Plaintiff and the Firm. The most economical explanation for Regenerex's same-

11

afternoon knowledge of, and reaction to, an inquiry directed solely to the Firm is that the Firm conveyed it to a person at Regenerex with authority to retaliate.

35. One plausible channel for that conveyance is a personal relationship between Defendant McKennon and Yasmine Berg, the undisclosed controlling person of Regenerex. Berg's December 12, 2025 text message refers to "Mike the Majority partner," and Berg referenced "Mike" to Plaintiff by name in a recorded conversation. The Firm's only partner named Mike is Michael McKennon. A personal relationship between the Firm's founding partner and the undisclosed controlling person of the audit client, in conjunction with Berg's de facto control, impairs the Firm's independence under SEC Rule 2-01 of Regulation S-X, PCAOB Rule 3520, and the AICPA Code, and is consistent with — and helps explain — the Firm's uncritical acceptance of Berg's informal direction over Regenerex's financial reporting. Berg corresponded directly with the Firm's engagement personnel concerning Regenerex's filings and audit, including on the Company's draft Form 10-K, and dealt directly with Defendant McKennon; she directed the payment of the Firm's fees through written instructions; and she involved herself in the granting of audit-portal access. The Firm's tolerance of direction over a public issuer's reporting from an undisclosed controlling person communicating largely from a personal AOL account is itself an independence and audit-evidence failure. That conveyance channel did not stop with Berg. Berg directed and coordinated the conduct of Regenerex director Lee Ori — the author of the May 5, 2026 cease-and-desist described above — and, on information and belief, Ori did not act on the matters at issue, including the audit and Plaintiff's communications with the Firm concerning it, without Berg's direction or input. Berg's contemporaneous texts reflect that coordination: on January 23, 2026 she wrote that she would "call Lee then call you," and on February 11, 2026 she reported that she had "got off the phone with Lee," was "waiting for Lee to call," and was "calling now". During that same February 11, 2026 telephone call (described in Paragraph 24), Berg presented her plan for addressing the matters Plaintiff had identified and Ori expressed his agreement with Berg's proposed path — corroborating the agreement underlying Count II. The documented personal relationship between the Firm's founding partner and Berg, Berg's direction of Ori, and Ori's same-day cease-and-desist describe one such channel — from McKennon, through Berg, to Ori. Whether the Firm's conveyance in fact ran through Berg or instead through a direct communication from the Firm to a Company officer, the inference is the same: Plaintiff's

12

May 5 inquiry, transmitted only to the Firm, reached within hours the person who then ordered Plaintiff to cease communicating with the Firm — a result only the Firm could have set in motion.

36. The centrality of that relationship to the engagement is reflected in Berg's own statements to Plaintiff and in the documentary record. In multiple telephone conversations with Plaintiff, Berg stated that her personal relationship with McKennon was the reason the Firm remained Regenerex's auditor — that, but for that relationship, the Firm would no longer have been the Company's audit firm. Plaintiff pleads the substance of those statements on his personal knowledge as a participant in the conversations. The documentary record is consistent with that account. Berg dealt directly with the Firm on the audit: in a December 12, 2025 text she advised Plaintiff she was "going on call now again with Mike the Majority partner" regarding the audit invoice, and on February 12, 2026 she advised that she was "on phone to auditor" and directed that the Firm's consultant be added to the audit portal. Berg likewise directed the content of Regenerex's public filings while the Firm's engagement personnel participated: from her personal AOL account she returned detailed, line-by-line comments on the Company's draft Form 10-K, directed Plaintiff to consolidate them into a single "clean" filing version, and corresponded on the same thread with the Firm's engagement personnel — including D'Elia, who responded directly — concerning that filing; on that thread Berg directed the characterization and the payment figures for the $10,000,000 contingent-consideration obligation addressed in Paragraphs 19 through 21. A registered public accounting firm that accepts direction over a public issuer's audit and reporting from an undisclosed controlling person — whose own stated explanation for the Firm's continued retention is her personal relationship with the Firm's founding partner — has not maintained the independence in fact and appearance that SEC Rule 2-01 of Regulation S-X, PCAOB Rule 3520, and the AICPA Code require.

**F. The Firm's Motive: Avoiding Restatement and Its Own Exposure**

37. Acknowledging the matters Plaintiff reported would have required Regenerex to restate approximately two to three years of previously filed SEC reports. For Regenerex's principals, those restatements meant public confirmation of the insider transactions and misstatements Plaintiff had documented. For the Firm, they meant something equally serious: public confirmation that the Firm's own audits — on which it had issued opinions — had failed to detect, or had

13

affirmatively accepted, the very misstatements at issue, with attendant exposure to PCAOB inspection findings, SEC scrutiny, professional-liability claims, and the loss of the engagement.

38. The Firm faced a second, independent exposure: the undisclosed personal relationship between its founding partner, Defendant McKennon, and Yasmine Berg, the Company's controlling person, together with the Firm's acceptance of Berg's informal direction over Regenerex's reporting — an independence violation under SEC Rule 2-01 of Regulation S-X and PCAOB Rule 3520 that acting on Plaintiff's disclosures would have brought to light.

39. The Firm therefore did not stand apart from Regenerex's response to Plaintiff's disclosures; it shared the principals' interest in suppressing them. That common, self-protective interest — avoiding the restatement and the exposure of the Firm's own conduct — explains why the Firm aligned itself with the subject of the disclosures, against the certifying officer who made them, and supplies the motive for the conduct alleged in Sections IV.D and IV.E above.

**G. Causation and Harm to Plaintiff**

40. As of March 31, 2026, Regenerex's transition-period Form 10-K for the nine-month period ended December 31, 2025 was substantially complete except for the audit adjustments and disclosures Plaintiff had identified as required — removal of the fictitious Greenwich note, booking of the CEO self-dealing items, and disclosure of the unregistered insider stock sales — adjustments that awaited the Firm's audit testing and recommended entries. By late March 2026 the audit had stalled, not through any omission by Plaintiff, but because the Firm had closed the shared audit workspace and ceased work. Regenerex could not file an accurate transition-period 10-K without those adjustments, and the adjustments could not be avoided so long as Plaintiff remained the certifying officer.

41. A competent, independent auditor that had received a Section 10A notification from the certifying officer would have evaluated the disclosures on their merits, communicated with that officer, and pressed the issuer to correct its filings. The Firm did the opposite at every step. Its alliance with management, its exclusion of the certifying officer from the audit, its conveyance of his protected communications to those with authority to retaliate, and its failure to make the Section 10A report, resignation, or Form 8-K disclosure its position required, were each a substantial factor in bringing about Plaintiff's suspension on March 31, 2026 and his purported for-cause termination

14

— voted April 27, 2026 and effected by notice delivered May 2, 2026. Had the Firm performed its duties rather than aligned against Plaintiff, the issuer could not have avoided the required adjustments by removing him, and the retaliatory strategy could not have proceeded as it did. The for-cause rationale on which the termination purportedly rested was pretextual, confirming that the termination the Firm's conduct enabled was not independently justified. No officer, director, or employee raised any performance, conduct, or fitness concern about Plaintiff before his March 11, 2026 disclosures; to the contrary, in December 2025 the CEO described Plaintiff in writing as "the best CFO Regenerex has ever had." On March 12, 2026 — the day after the disclosures — the Board unanimously acknowledged Plaintiff's role and contributions in a resolution that Directors Ori and Hazen executed by DocuSign on March 16, 2026, fifteen days before they voted to suspend him. Plaintiff's March 31, 2026 self-evaluation against each of the nine duties in Exhibit A to his Employment Agreement documented satisfactory or affirmative performance, uncountered by any contemporaneous Board or management evaluation. The "cause" asserted only after the disclosures was manufactured to supply cover for the retaliation.

42. Plaintiff has suffered direct and foreseeable harm, including loss of employment, loss of vested and unvested equity compensation and warrants, loss of bonus consideration, loss of professional opportunity, and reputational harm to a thirty-nine-year career dependent on association with reliable financial reporting. Plaintiff cannot return to the CFO role because doing so would require him either to certify filings consistent with materially false prior filings or to precipitate the disclosure crisis the retaliation was designed to defer. The Company has compounded that harm through successive Form 8-K filings that contain inaccurate statements and partial truths concerning Plaintiff; those filings are public and have effectively foreclosed Plaintiff from obtaining comparable employment as a chief financial officer. Plaintiff's losses therefore extend well beyond the compensation remaining under his Employment Agreement to the loss of future earnings and diminished earning capacity over the remainder of his professional career.

## V. CAUSES OF ACTION

### COUNT I — Tortious Interference with Contractual Relations
*(Against all Defendants)*

43. Plaintiff incorporates by reference all preceding paragraphs.

15

44. Plaintiff and Regenerex were parties to a valid and enforceable written Employment Agreement that entitled Plaintiff to continued employment subject only to a defined for-cause process. The Firm, as Regenerex's auditor of record working directly with the Company's CEO, Board, and CFO, was aware that Plaintiff served as CFO under an employment agreement.

45. Defendants intentionally and without justification induced and procured the breach and disruption of that Employment Agreement: by conducting the audit through the subject of Plaintiff's disclosures while excluding the certifying officer; by withholding audit communications from Plaintiff; and by conveying Plaintiff's protected communications to persons at Regenerex with authority to retaliate. Defendants intended to cause, or knew to a substantial certainty that their conduct would cause, the disruption and breach of the Employment Agreement, and did cause it through Plaintiff's suspension and purported for-cause termination. Defendants acted for their own institutional benefit — to avoid the restatement and exposure described in Section IV.F, including adverse PCAOB inspection findings, SEC scrutiny, professional-liability exposure, and the loss of the engagement — and not in furtherance of any legitimate audit function. Their conduct was not the rendering of honest, good-faith professional advice within the scope of the audit engagement, and is therefore shielded by no privilege that protects an accountant's honest professional advice. The means Defendants employed were improper within the meaning of Tennessee law: they violated recognized professional and regulatory standards governing auditors — including the auditor-independence rules and Section 10A of the Exchange Act — breached the duties attaching to the Firm's position of trust as the issuer's auditor of record, and involved the misrepresentation and concealment of material facts. Defendants McKennon and Boyer are each individually liable for this conduct: Boyer personally directed the Firm's response to Plaintiff's disclosures as its designated objectivity reviewer (Paragraphs 28 through 30), and McKennon personally supplied the channel by which Plaintiff's protected communications reached those with authority to retaliate (Paragraph 35). Under Tennessee law, one who personally participates in tortious conduct is individually liable for it and does not escape liability by acting through or on behalf of the Firm.

46. Plaintiff is entitled to relief under Tenn. Code Ann. § 47-50-109 and Tennessee common law, including treble damages as available under the statute.

**COUNT II — Civil Conspiracy and Concert of Action**

16

*(Against all Defendants)*

47. Plaintiff incorporates by reference all preceding paragraphs.

48. Defendants, in combination with one or more of the Regenerex principals and with Yasmine Berg, agreed — expressly or by concert of action — to suppress Plaintiff's protected disclosures and to maintain the issuer's false reporting posture, in order to avoid the restatement of the Company's filings and the exposure of the Firm's and the principals' own conduct. Because the combination was between the Firm, on the one hand, and Regenerex's principals and Berg, on the other — separate persons and entities — it is not a corporation merely agreeing with itself, and the intracorporate-conspiracy doctrine does not bar this claim.

49. Defendants committed overt acts in furtherance of the agreement, including conveying Plaintiff's May 5, 2026 inquiry so as to produce the same-day cease-and-desist directed at his auditor communications; excluding the certifying officer from the audit while dealing with the subject of his disclosures; and declining to make the Section 10A report, resignation, or Form 8-K disclosure that would have exposed the scheme. Plaintiff was damaged as a direct and proximate result.

**COUNT III — Reckless Misrepresentation and Gross Negligence**
*(Against all Defendants — Pleaded in the Alternative)*

50. Plaintiff incorporates by reference all preceding paragraphs.

51. Defendants did not merely fail to detect concealed fraud. They consciously disregarded red flags so obvious that a reasonable auditor could not have missed them. Defendants confirmed and accepted contingent-consideration treatment that kept a $10,000,000 related-party obligation owed to the CEO off the Company's balance sheet — without the related-party confirmation, scrutiny, or disclosure the item required — while the controlling parties treated and collected on that same obligation as a fixed, enlarged personal note; and they recorded a $2,400,000 obligation to an unverifiable counterparty with no confirmation of the counterparty's existence, no confirmation of the signatures, and no valuation of the consideration. The Firm's uncritical acceptance of Ms. Berg's representations is consistent with, and is explained by, the undisclosed personal relationship between the Firm's founding partner and Ms. Berg, the controlling person who benefited from those representations.

17

52. A misrepresentation made recklessly, or with conscious disregard for its truth or falsity, is actionable by any person who foreseeably and justifiably relies on it, and is not subject to the limitations that constrain ordinary professional-negligence claims brought by persons who are not the auditor's client. Defendants supplied false information with reckless disregard for its truth; Plaintiff foreseeably and justifiably relied on it; and Plaintiff was damaged. Defendants' conduct was of such a character as to support an award of punitive damages. Plaintiff's reliance was that of the officer required to certify the Company's financial statements under Sections 302 and 906 of the Sarbanes-Oxley Act: in reliance on the Firm's opinions he undertook and continued in the certifying role and staked his professional standing on financial reporting grounded in the Firm's work, and that reliance was a direct and proximate cause of his pecuniary loss when the Firm's failures were exposed through his own discovery and disclosure.

**COUNT IV — Negligent Misrepresentation**
*(Against all Defendants — Pleaded in the Alternative)*

53. Plaintiff incorporates by reference all preceding paragraphs.

54. In the course of their profession, Defendants supplied audit opinions and audited financial statements for the guidance of others, including Plaintiff, in their business transactions. Tennessee follows the Restatement (Second) of Torts § 552 in imposing liability on a supplier of information to a person, or a limited group of persons, for whose benefit and guidance the supplier knows the information is intended.

55. Defendants knew that the issuer's CFO was a person who would rely on the audit opinions — both in deciding to accept the position and in performing the statutory certification function. The audit opinions were false or were prepared without reasonable care, in the respects set forth in Section IV.B above. Plaintiff justifiably relied on them and was damaged as a result. As the officer required to certify the Company's financial statements personally under Sections 302 and 906 of the Sarbanes-Oxley Act, Plaintiff was not merely a foreseeable user but the specific, intended user for whose benefit and guidance the Firm's audit opinions were supplied. In justifiable reliance on the Firm's prior unqualified opinions, Plaintiff undertook and continued in the certifying role and staked his professional standing on financial reporting grounded in the Firm's work; that reliance was a direct and proximate cause of his pecuniary loss, because when the Firm's failures were

18

exposed through Plaintiff's own discovery and disclosure, the position, equity, and career he had committed in reliance on the integrity of the Firm's work were destroyed.

### COUNT V — Professional Negligence
*(Against all Defendants — Pleaded in the Alternative)*

56. Plaintiff incorporates by reference all preceding paragraphs.

57. Defendants owed a duty to perform their audit and assurance services with the degree of care, skill, and diligence exercised by reasonably prudent PCAOB-registered auditors, including compliance with applicable PCAOB Auditing Standards. Defendants breached that duty in the respects set forth in Sections IV.B through IV.E above. That breach was a direct and proximate cause of Plaintiff's damages.

### Punitive Damages
*(Against all Defendants)*

58. Defendants' conduct, including the independence failure and the reckless departure from professional standards in the face of a documented Section 10A notification, was intentional, fraudulent, malicious, or reckless, supporting an award of punitive damages under Tennessee law.

### VI. DAMAGES

59. Plaintiff seeks compensatory damages in an amount to be proven at trial. Those damages include his lost base salary and performance bonus, measured by reference to the term of his Employment Agreement; the value of his equity compensation under that Agreement, including his grant of four million (4,000,000) stock options vesting monthly over three years and his warrant grants, with the equity valued by reference to the $0.50 per-share value the Company itself used to expense stock-based compensation in its audited financial statements for the fiscal year ended March 31, 2025 (a conservative, audit-established figure rather than a litigation-derived one); and his lost future earnings and diminished earning capacity, reflecting both his reasonable expectation, when he accepted the role, of continued employment through the Company's anticipated acquisition and the foreclosure of comparable chief-financial-officer employment caused by the retaliatory campaign and the Company's inaccurate public filings. These categories — together with additional warrants under the contractual ongoing-vesting schedule, securities-related damages, attorneys' fees and statutory enhancements, and punitive damages, all of which

Plaintiff reserves — are reasonably calculable from the Employment Agreement and the Company's own records and will be proven at trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly and severally, for: (A) compensatory damages in an amount to be proven at trial; (B) treble damages on the tortious-interference claim under Tenn. Code Ann. § 47-50-109; (C) punitive damages; (D) pre- and post-judgment interest at the maximum lawful rate; (E) costs of suit and, as available, attorneys' fees and litigation expenses, with leave to amend through engaged counsel; and (F) such other relief as the Court deems just.

## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted this 25th day of June, 2026.

Kenneth W. Perry, *pro se*
876 Westchester Circle
Hendersonville, Tennessee 37075 (Sumner County)
kennethwperry@gmail.com · 615-513-9300